Please call the third case. 114-1896, Dollar Tree Stores. This does not seem well-denialed. Good morning, Your Honors. Thomas Dill on behalf of Dollar Tree Stores. This is a case in which the respondent, Dollar Tree, has acknowledged that there was an accident, that there was an injury, paid for medical, paid for the TTD. The problem appears to be whether or not that Ms. Maldonado should have everything wrong with her repaired at the same time. This is a case where she was one of four people taking off boxes off a conveyor. She's one of four. There's just one driver on the other end loading, so it doesn't appear to be any great rush since she's only doing 25 percent of the work. She takes off some bottled water, and then she says on the 10th box, and the bottled water, she said, were 20 to 25 pounds, and then there were some bleaches that were 10 to 15 pounds each. 10 pounds. At the 10th box, she says, both elbows snapped, numbness and pain in her right arm from her fingers to her elbows, and she went home, finished the day, went home and iced both elbows. And she kept working until November 8th. The accident was on September 21st, 2010. She keeps working, but meanwhile, she goes to see Dr. Annie Callaghan on September 30th. That's a week, 10 days after the accident. And she's sent for physical therapy. What is it that you're disputing? There was no accident at all, lack of causal connection. What is it that you're disputing? We have acknowledged that there was an accident injuring her shoulder. Both shoulders, actually. And we sent her to the shoulder doctor, and the shoulder doctor fixed it. And he sent her back to work the following July. We paid her TTD through that. The problem we have is that she later, she said specifically, there was no neck pain when she was first injured, but the neck pain came on later. Well, within days, according to the physical therapist Hoff, the claimant said that within days of the accident, it was documented she reported pain in her neck. She continued to experience it up to the date of the hearing. So we can't say she never said she didn't have neck pain. Oh, she said she had, frank neck pain came in February after the September accident. She said previously that she had pain up to her elbows, and then she also described pain that went up from her hands, up her arm, around and over and down her other arm. And she went to see Dr. Gransler. And he took her history. A 45-year-old female comes to Dr. Kellerman for evaluation of bilateral shoulder pain radiating down toward her elbows since the injury. She sustained September 21, 2010. Let me just see if we can short-circuit this a little bit. Claimant clearly testified that she had no problems with her neck pain, nothing, no neck-related symptoms prior to September 21, 2010. She testified she did not have any cervical pain. Following the work accident, she began experiencing symptoms involving her neck that persisted to the date of the arbitration hearing. And the commission believed her, did they not? She said at the arbitration hearing. And the commission believed her, correct? They don't really say specifically. They just kind of say what all happened. Did the arbitrator rule in her favor? They ruled in her favor. And the commission ruled in her favor, right? They ruled in her favor. They basically affirmed. So they didn't say anything. They just said, okay, he's right. But the question is, where are the facts in his determination to support that? Because she said. What about Kranzler's opinion? Kranzler's opinion is based on. His cervical radiculopathy and the opinion that the claimant's neck condition is related to the incident she described as having occurred on September 21. Dr. Sue didn't agree. That's. And the commission resulted in favor of the opinion of Kranzler. That's because he specifically said, keep in mind that an opinion is only as good as the facts it's based upon. And in this case, he was asked, what is the basis of your opinion? And what was the mechanics of the injury? She said, oh, I don't know. It's just all I know is she didn't have any symptoms in her neck prior to that date. But she told the therapist at the Ann Clinic shortly after the accident that these symptoms in her neck she'd had for several months. So how is that? Let's assume that that's true. Again, according to Kranzler, they were mild in comparison to the symptoms occurred after the aggravating activities on the date of the work accident, which seems to be the theme this morning. In order for the injury to be compensable, it doesn't have to be the only cause or the sole cause or the major cause. If it's a causative factor in the claimant's condition of ill-being, it is compensable. And you recognize that law, correct? Correct. But there still has to be some connection in the evidence demonstrating that. She testifies, and Kranzler gives the connection, doesn't he, in his opinion? Kranzler said that it's his opinion because she had never had symptoms before, but she told the therapist she'd had them for several months. No, I think you're not giving a fair assessment of Kranzler. Kranzler added that even if the claimant had symptoms for several months prior to September 21st, he acknowledges that in his opinion. He said they were mild in comparison to the symptoms that were aggravated after the incident. Now, didn't he say that? He said that, but that one of the symptoms he gave her, rather than an EMG, he gave her the DSS. Yeah, but it isn't like you can fairly say Kranzler didn't even know about this. He never even considered it in his opinion. He specifically considered it. He considered it. He's aware of it. He considered it and said that those records must be wrong. He said those have got to be a typo with no evidence. And the reason he said they must be a typo is because if they're correct, that blows his whole theory. So, therefore, the records must be wrong. That's his testimony. Whether he says the records were wrong, he still gave an opinion acknowledging the possibility of symptoms prior to September 21st. And you're trying to weave your way around that, but you can't. And he's saying that they were much worse, but if you look at his physical examination, his one physical examination on March 8th, because he saw her five times, examined her once, her findings were negligible. She had a slight range of motion reduction. When he talked about her MRI, he said the MRI, he agreed, there were mild broad-based osteophytes that had taken many months or years to form, no disc herniation, but mild bulging with preexisting osteophyte formation contributing to very mild right side neurofibrominal narrowing, no evidence of central canal stenosis or cord compression. And he agreed that all findings are mild or very mild and all are arthritic changes. So what is the aggravation? Is there a compression? No. Is there a herniation? No. All that's there are the osteophytes that have been there and taken months or years to form. And she started complaining about it in February. Before that, it was very mild. When she talked to Dr. Slamberg, she did not say anything about, I'm now having neck pain. She did say, however... Hoff's notes are from October the 14th, 2010. That's less than a month after the event. What does he say in those notes? She gave him a history of lifting at work, her elbows gave out, causing strain on her shoulders and her neck. And that's less than a month after the event. A strain on her shoulders or her neck? Yeah. On her neck. Well, Dr. Slamberg found it was the problem with her shoulders bilaterally. The right was worse and he operated. And he did not find any problem with her neck. I'm assuming that if he's in the neighborhood, he's going to be looking at the entire situation. Do you really think you can say in the face of Hoff's notes, in Kranzler's opinion, that this decision of the commission is against the manifest weight of the evidence? Yes, because there's no evidence connecting the neck to the specific event in September. Other than Hoff's notes. The notes of the... Of a complaint by her. He didn't make that up. That was the history given to him by her. The history shows that she was complaining of pain going up her arms to her neck, not from her neck downward. That's what Dr. Sue said. No, I'm talking about what Hoff said, not what Dr. Sue said. Dr. Sue's opinion was not accepted by the commission. It was rejected. So as far as Sue's concerned, there is no connection to the work injury, work accident. So my only question is, you've got Kranzler's opinion that there is a causal connection. You've got Hoff's records where less than a month after this event of September, she tells him that her elbows came out and caused a strain on her shoulders and her neck. Now, I suppose my question is, no reasonable trial or fact could come to the conclusion that the commission came to based on that evidence? When the therapist, she told the therapist it had been going on for several months, those neck... Did she say that she felt a strain when her arm gave out, yes or no? She said that she had no pain in her neck at all at the time of the accident. Did she say her shoulders gave out? Does his records reflect that she told him that her elbows gave out causing strain on her shoulders and her neck? That takes a yes or no. That was a yes. Okay. That's her history. But her testimony was that she had no neck pain and it was strictly her elbows. Now, if she later has neck pain and then says she wants to associate it, that's fine. But she's not the physician. And the physician... First of all, the therapist said it's been going on for several months. The shoulder surgeon says past history of neck problems, although she denied it. Dr. Kranzler bases his entire... Well, I think we know the evidence. We could go around and around and belabor this, but let me just ask you one final very pointed question. What if there was no medical evidence in this case and the commission simply believed the claimant? That's all. He testified there's no doctors at all. The commission believed the claimant. Can they do that? No. Oh, really? No. When she testified very clearly, I hurt my elbows and I went home and iced them. And we said, okay, the commission can believe her. We believe her. We pay her for that. It's when she comes in and says later, oh, by the way, I forgot. Even though I said I had no pain, I also really injured my neck at the same time. Well, the commission heard that, right? Obviously they heard it, didn't it? The arbitrator heard it, yes. And notwithstanding that, they believed her. That's your problem in this case, to put it very bluntly. No, she can't diagnose herself. She can have a chain of events. There was nothing wrong with my neck prior to September the 1st, 2010. She testified that she had nothing wrong with her neck prior to that day. And now all of a sudden on that day, within a month, she's complaining that she had a strain of her neck, and she's got a doctor that diagnoses cervical radiculopathy and gives an opinion that the incident she described was causally related. So, I mean, you understand where we're at here. She can tell that after that. But she told the therapist at the beginning that I've had those symptoms for months, and Dr. Kranzler and everyone else agrees with the osteophytes and everything, she's had this ongoing, longstanding arthritic condition in her neck. Even if that's true, it doesn't look good in recovery, does it? If she had aggravated it. But I don't see any evidence of any aggravation in here because it was months later she came up with this. Counsel, your time is up. Okay, thank you. Counsel, you may respond. Thank you. Good morning, Your Honors. Please, the court, my name is James Naraki. Counsel, I also would like to introduce the court to my two paralegals who have helped me on this case, who are seated there. Thank you. Your Honors, the defense in this case has always been about taking certain things out of context and then trying to build a case around it, okay? This lady is a manager of a dollar store, and as you know, this is not where she sits in an office and drinks coffee and smokes a cigarette. She has to participate in the physical work of this. What defense counsel didn't mention is that the load of boxes that day was 1,700 boxes. And so if she was one-quarter of that, that meant that she was responsible that particular day for the unloading of approximately 422 of those boxes. Does that really make any difference? I mean, he's arguing, well, there were four of them, she only unloaded one. No, it doesn't. She picks up one box, gets injured, discompensable. You're absolutely correct, and that's exactly what happened. We alleged both repetitive and a discreet injury. The arbitrator found discreet injury, and that's fine. But their whole defense really rests on two things. One is she didn't have immediate neck pain, so therefore her neck wasn't injured. And our doctor says there's no way that she could have been injured. On her date of first presentation to Dr. Ann Callahan on the 30th of September, which is after there's approval from the carrier to come because there's a claim on the sheet, the history given at initial presentation is brief medical history, pain in the right shoulder and right side of the neck radiating to both elbows and both arms. So an initial presentation, radiculopathy is present. The defense goes on and on about this issue, about prior problems. What is never mentioned, of course, is that there were two histories at the same facility on the same day. One was to an occupational therapist, one was to a physical therapist. The one to the occupational therapist mentions about the fact that she has had problems in the past. The one to the physical therapist says patient states that on September 21, 2010, she was taking things off a truck at work, putting them on us, into the store when she felt like her elbows gave out, which caused strain on shoulders and neck. Patient states pain she immediately felt at the elbow went down to shoulders and neck. There's no medical evidence whatsoever, either testimonial or documentary, that she ever had problems with her neck. It's a typographical error. The exclusive province of the industrial commission is to weigh conflicting testimonies and to make a decision. It's a question of fact. And then lastly but not leastly, their defense relies upon the opinions of their independent medical examiner, Dr. Wellington Shue. And even though there was a very brief examination, approximately 10 minutes, his opinions are basically based on the documentation that was provided to him by respondents, so he could do a records review. And his ultimate opinion is based on the fact that there were no complaints of neck pain until February or approximately four or five months post-accident. And in our brief, what I've read you and things like that, it's very clear from the onset that there was pain and there was radiculopathy. And that is the reason why in the ultimate decision of the arbitrator and confirmed by the commission, they said they gave absolutely no weight to his opinions at all because it was based on a factual impossibility. And so for all those reasons, we ask respectfully that you confirm the decision of the commission and let Ms. Meldenado get her surgery. Thank you, Counsel. Counsel, you may reply. Very briefly, I'm going to talk about Dr. Shue and his examination. Dr. Steinberg was the treating physician and surgeon, and he found no cause for pain other than her shoulders. He was a board-certified orthopedic surgeon, treated her, operated her. He was in there looking around. And he traced the injury from this accident to the bilateral shoulders, the right needing surgery, the left needing therapy. Nothing in his records showed any problem with the neck. I think before he started operating her shoulder, he would have investigated her neck. If, in his experience as a board-certified orthopedic surgeon, he thought there was something to her neck other than preexisting mild arthritic changes. And she does not, for mild changes, without any kind of compression, back to work full duty all these years, she does not need to have a fusion to just make things worse. Thank you. Thank you, Counsel, both for your arguments and matter this morning. We've taken your advisement. Written disposition shall issue. Court is adjourned.